THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
CIVIL ACTION NO: 1:08CV000394

| | |
|---|---|
| AIMEE SNOW WAGONER )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>AMERICAN FAMILY LIFE )<br>ASSURANCE COMPANY OF )<br>COLUMBUS d/b/a AFLAC, )<br>INCORPORATED, )<br>)<br>Defendant. ) | MEMORANDUM IN OPPOSITION<br>TO DEFENDANT'S MOTION TO<br>DISMISS AND COMPEL ARBITRATION |

Plaintiff Aimee Snow Wagoner submits this brief in opposition of Defendant AFLAC's Motion to Dismiss and to Compel Arbitration.

## STATEMENT OF THE CASE

Plaintiff, Aimee Snow Wagoner (hereinafter "Ms. Wagoner") filed the above captioned case on or about June 12, 2008, alleging both state and federal statutory claims. On August 11, 2008, Defendant AFLAC filed a Motion to Dismiss and to Compel Arbitration. On or about the 22nd day of August 2008, the court granted Ms. Wagoner's Motion for Extension of Time to Respond to Defendant's Motion to Dismiss and Compel Arbitration. On or about September 22, 2008, Ms. Wagoner filed an Amended Complaint together with her Memorandum of Law in opposition to Defendant's Motion to Dismiss and to Compel Arbitration. On or about September 22, 2008, Defendant withdrew its Motion to Dismiss and Compel Arbitration on the basis that its motion was rendered moot because the pleading it referred to was no longer operative.

## FACTS

1

On or about June 8, 1998, Ms. Wagoner entered into an agreement called "Associates Agreement". In the agreement Ms. Wagoner was designated as an independent contractor. (Doc. No. 1, Compl. ¶¶ 5, 6). She proved herself to be one of AFLAC's most effective sales associates. (Id. ¶11). Despite being considered an independent contractor, Ms. Wagoner believes and alleges that she was an employee of AFLAC based upon multiple factors in her relationship with AFLAC. (Id. ¶ 6 a-o). As an employee of AFLAC, Ms. Wagoner was entitled to recover benefits of an AFLAC employee. (Id. ¶ 7). Although Ms. Wagoner did not receive benefits appropriate for an employee, AFLAC did provide a Stock Bonus Plan for its sales associates. Ms. Wagoner enrolled in the plan in June 1998 and continued to make regular contributions to the plan up until the date of her termination in or about December 28, 2005. (Id. ¶¶ 8-10).

On or about October 3, 2003, Ms. Wagoner was away from her office. Upon returning, she discovered that someone had broken into the office. A cellular modem card had been inserted into her lap top computer. There were also phone cords hanging from the laptop. (Id. ¶¶ 10-11). Ms. Wagoner was concerned that because of the possible computer breach, personal information including Protected Health Information, had been compromised on her and approximately 6,000 other individuals, most of which were insured by AFLAC. As a result of her concern, she contacted the appropriate individuals and agencies. (Id. ¶ 14).

Following notification of the break-in and potential problems, AFLAC took no action to protect, Ms. Wagoner, employees, sales associates or its insureds from the use of their personal information. Subsequently, Ms. Wagoner began to notice that customer files in her computer were changed and altered. Again, she notified the appropriate individuals at AFLAC and received no response. This also heralded the beginning of the deterioration in Ms. Wagoner's employment relationship with AFLAC. Ms. Wagoner was investigated for alleged customer

complaints. Following an investigation, AFLAC's investigator notified Ms. Wagoner that the charges were unfounded. (Id. ¶¶ 15-17).

In 2004, Ms. Wagoner began to realize that funds were missing from her bank accounts. Again, Ms. Wagoner fearing that information from her computer was being inappropriately breached. She notified AFLAC legal department and reported that she believed that someone was using fraudulently obtained information through the AFLAC computer system. (Id. ¶¶18 – 19).

In December 2005, AFLAC terminated Ms. Wagoner's employment. Shortly thereafter, Ms. Wagoner again went to her office and discovered AFLAC computers running, despite no one being in the office. Again, she notified risk management at AFLAC of her concerns. Despite her repeated notification to AFLAC, in January 2006, AFLAC requested that the North Carolina Department of Insurance investigate Ms. Wagoner for writing fictitious insurance applications and filing false insurance claims. Subsequently, a case against Ms. Wagoner was presented to the Grand Jury in Yadkin County. When Ms. Wagoner obtained the discovery notebook from the District Attorney, she realized that it contained documents and checks allegedly signed by her. Ms. Wagoner did not sign these check and/or documents. Subsequently, AFLAC was unwilling to take calls from Ms. Wagoner's counsel to discuss any of these issues. (Id. ¶¶ 20 – 25.)

### ARGUMENT

I. **Standard of Review.**

A complaint that fails to state a claim upon which relief can be granted must be dismissed. *See* Fed. R. Civ. P. 12(b)(6). The intent of Rule 12(b)(6) is to test the legal

3

sufficiency of a complaint. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994). The rule is not intended to resolved contests surrounding the facts, the merits of a claim or the applicability of defenses. *Edwards v. City of Goldsboro,* 178 F.3d 238, 243 (4th Cir. 1999). The court must accept as true all well-pleaded allegations and construe those allegations in the light most favorable to the plaintiff. *Randall*, 30 F.3d at 522. The complaint cannot be dismissed unless, after drawing all reasonable inferences from the facts in plaintiff's favor, it appears beyond doubt that the plaintiff can prove no set of facts that would support his claim and entitle him to relief. *Edwards,* 178 F.3d at 244; *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

>   II.     **AFLAC's Motion to Dismiss should be Denied because Ms. Wagoner States a Claim under the North Carolina Unfair and Deceptive Trade Practice Act because the Acts that She Complains of Occurred outside of the Employee Relationship.**

Plaintiff has alleged that the defendants committed an unfair or deceptive act or practice in or affecting commerce and she was injured as a result. (Amended Compl. ¶¶ 5, 6, 18, 19, 38, 39). Ms. Wagoner met each of the pleading requirements outlined in *Gress v. The Row Boat Company, Inc.*, 661 S.E.2d 278, 281; 2008 N.C. App. LEXIS 1074 (2008). An act is deemed unfair and deceptive when it is "offensive, oppressive and outrageous". Id, *citing Mapp v. Toyota World, Inc.,* 81 N.C. App. 421 at 426, 344 S.E.2d at 3301.

A deceptive practice is one that has the tendency to deceive. An unfair practice offends public policy. Good faith is not a defense. Such acts are unlawful. *Gray v. Tower Circle Motel*, 352 N.C. 61, 68; 529, S.E.2d 676, 681 (2000). Ms. Wagoner has pled that AFLAC failed to take any action to safeguard her personal information related to her insurance coverage, her social security number, place of residence, and banking information, despite being warned that there had been a substantial breach in security. AFLAC did not. Its failure to act was the proximate

4

cause of Ms. Wagoner's information being used to establish a false identity in her name. Charge accounts were opened in her name that accrued excessive debt. Additionally, her bank account was breached.

Plaintiff argues that the employer-employee relationship between Ms. Wagoner and AFLAC precludes her from bringing a claim under the act and that such a relationship is not in or does not affect commerce. Commerce is defined as a "business activity, however denominated". N.C. Gen. Stat. § 75-1.1(b). AFLAC is in the business of insurance and as part of its business activity, it sells stock to consumers.

The statutory language of N.C. Gen. Stat. 92.1, excludes claims under the act for certain classes of individuals. Case law has further expanded the types of relationships that are not covered under the act. Generally, the unfair or deceptive act must occur outside the context of the employment relationship. *Gress* at 282. The conduct must affect the plaintiff beyond the scope of his or her employment. *A1 Pavement Marketing, LLC v. APMI Corporation,* 2008 NCBC 13, citing *Gress* at 282. However, the mere presence of an employer-employee relationship is not sufficient to prevent a party from receiving damages under the act. *Dalton v Camp*, 353 N.C. 647, 548 S.E.2d 704 (2001).

Looking at the facts in the light most favorable to Ms. Wagoner, she is a consumer within the meaning of the statute and the employment relationship should not bar her from recovery under the act for the damages she incurred. Ms. Wagoner's duties and the terms and conditions of her employment are an entirely separate issue from that of her right to have her identity protected when she enters into a legitimate business transaction outside the scope of her employment.

**III.    Ms. Wagoner's Claim is not Pre-empted by ERISA.**

Pre-emption of state law claims is not favored and will not be enforced unless Congress has clearly mandated that such pre-emption will occur. *Florida Lime and Avocado Growers, Inc. v. Pall*, 373 U.S. 132, 142 (1963)). Congress's purpose in enacting the ERISA pre-emption was to ensure that the Act provides standard regulations related to the administration of pension plans. This enables the employee to operate or move across state lines without fear of dealing with different rules and regulations.

The plain meaning of Section 514(a), ERISA's pre-emption provision, applies only to a state law that "purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans" covered by ERISA. The state law formulated by the North Carolina Legislature is totally unrelated to the regulation of the terms and conditions of pension funds. The statutory pre-emption language, therefore, is inapplicable to this case. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987). *See Ingersoll-Rand Co. v. McClendon*, 1989 U.S. Briefs 1298 (U.S. July 25, 2990).

Ms. Wagoner clearly pled her ERISA claim for her pension benefits and any issues related to the regulation and/or administration of the plans. Her claim for Unfair and Deceptive Trade Practices are brought under the appropriate state law. Her claim is for damages related to the identity theft that occurred as a result of AFLAC's failure to act when it learned that it had had a security breach. Her claim falls outside of her employment relationship and outside of any employer based benefit program.

**IV.    AFLAC's Motion to Compel Arbitration should be Denied because the Arbitration Provision is Unconscionable and Prevents Ms. Wagoner from Effectively Pursuing Statutory Remedies.**

6

Historically, both state and federal courts have been reluctant to enforce arbitration agreements. Congress, recognizing this hostility enacted the Federal Arbitration Act. The purpose of the Act was to provide a simpler and more expedient method of resolving disputes. The courts, as a result, currently favor arbitration agreements contained within the terms of a contract. An arbitration provision to settle a controversy arising out of the terms of a contract which involves a transaction in interstate commerce shall be "valid, irrevocable, and enforceable" unless there are grounds at law or in equity for the revocation of the contract. 9 U.S.C. § 2 (2008). The Act does not replace state law. The language in section 2 ensures that the arbitration provision is on equal footing with other contracts. *Supak & Sons Mfg. Co. v. Pervel Indus., Inc.*, 593 F.2d 135 (4th Cir. 1974). Accordingly, courts look to state law for construction of the contract and whether grounds exist for its revocation, and will enforce such agreements absent clear legal grounds for striking an agreement to arbitrate.

### A. The Arbitration Provision is Unconscionable on its Face under North Carolina Law.

North Carolina law recognizes that equity may require the invalidation of an unconscionable contract. A contract is unconscionable:

> Only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other hand.

*Tillman vs. Citigroup*, 362 N.C. 93, 101, 655 S.E.2d 362, 368 (2008) (*quoting Brenner v. Little Red Sch. House Ltd,* 302 N.C. 207, 313, 274 S.E.2d 206 (1981). The court will not enforce a contract that is lacking in fundamental fairness or evenhandness. When the agreement to arbitration so clearly favors one party above the other, it is appropriate for the court to find that

7

the agreement is invalid. *Murray v. United Food and Commercial Workers Int'l Union, et al.* 289 F.3d 297, 302 (4th Cir. 2001). This is such a contract because there was unequal bargaining power between the parties, and the terms as applied to Ms. Wagoner are oppressive. AFLAC is a large sophisticated corporation using what appears to be boilerplate language in the agreement.

The arbitration provision in question is contained within an agreement titled, "Associates Agreement". (Am. Compl. Ex. B, Associates Agreement). The relevant provision within the Associates Agreement is ¶10: <u>Arbitration and Other Legal Proceeding</u>. AFLAC alleges that this is an agreement subsequent to the one Ms. Wagoner initially signed. However, AFLAC fails to describe the circumstance or give any facts that would indicate that there was adequate consideration for the agreement to arbitrate or whether it was a bargained for agreement. Regardless, the provision is unconscionable on its face. The agreement contains numerous provisions that no rationale person would have agreed to and which no fair person would accept. The arbitration provision between Ms. Wagoner and AFLAC, evidences a gross lack of evenhandness

      **B**.     <u>**AFLAC Reserves Claims from its Agreement to Arbitrate.**</u>

In its first sentence, the agreement excludes certain claims AFLAC might have from arbitration. Ms. Wagoner, on the other hand must arbitrate all claims including, federal and state statutory and common law claims, to the extent provided under the Act. (Am. Compl. Ex. B, Associates Agreement ¶10.1.) This evidences a contract unevenly balanced to favor AFLAC and allows it the ability to pick and chose those claims it wishes bring in court and those it wishes to arbitrate. AFLAC has also reserved the right to seek injunctive or other equitable relief in any court of competent jurisdiction. (<u>Id</u>., ¶10.5.)

8

When both parties to the provision agree to arbitrate all their claims, the courts will find that there is adequate consideration, based upon mutual promises of the parties. However, where one party reserves the right to seek remedies outside of arbitration, the agreement is illusory and there is no valid promise, the agreement will fail for lack of consideration. *Howard v. King's Crossings, Incorporated,* 264 Fed. Appx, 345 (4th Cir. Jan. 1, 2008) (unpublished) (agreement failed for lack of consideration where defendant reserved its right to injunctive relief and to bring suit for damages ( relying on *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005)).

### C. AFLAC Places a Limitation on Damages.

AFLAC has placed a significant limitation on damages. The provision disallows any claims or remedies other than claims of breach of contract and remedies and liabilities arising thereunder, (Am. Compl. Ex. B, Associates Agreement, ¶10.7.1.) This effectively leaves Ms. Wagoner no claim or remedy for many of the very claims she agreed to arbitrate. Conversely, AFLAC has not limited its damages in any way. This demonstrates the one-sidedness of the agreement and AFLAC's superior bargaining power.

### D. Ms. Wagoner may not participate in a Class Action Suit against AFLAC.

The arbitration provision prohibits Ms. Wagoner's participation in a Class Action lawsuit without AFLAC's consent. (Id, ¶10. 4). Where the agreement was one-side, prohibited the joinder of claims, and class actions and exposed the claimant to prohibitive costs, the court ruled that an agreement was unconscionable. *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 94, 655 S.E.2d 362, 365 (2008). In *Tillman*, the court felt that the prohibition against joinder of claims and class actions were unconscionable. First, it deterred plaintiffs from bringing cases in which there was a low damage amount and high costs that could not be shared with other

9

plaintiffs.  Second, it contributed to the one-sidedness of the provision because the prohibition against class action benefited only the corporation.  *Id* at 108.

    E.  **AFLAC Requires Ms. Wagoner to Arbitrate Third Party Claims Against**

  AFLAC has also required that Ms. Wagoner arbitrate claims against third-party individuals regardless of whether AFLAC is a party.  Under its terms, the agreement shall apply to "third party beneficiaries" including, "any past and present officers, stockholders, employees, associates, coordinators, agents and brokers of AFLAC, who are alleged to be liable or may be liable in any manner to either party based upon the same allegations made against a party to this agreement."  (Am. Compl. Ex.B, Associates Agreement ¶ 10.1).  While these individuals may be posed as third-party beneficiaries to the agreement, Ms. Wagoner would be unable to compel arbitration, thus losing her ability to have her claims heard, whether statutory or at common law. For example, Ms. Wagoner alleged identity theft in her Complaint. (Doc. No. 1, Compl. ¶¶ 32-42).  In the event she gains information identifying the individual who stole her identity, if they are a member of these "third party beneficiaries", she would be precluded from bringing these claims because she would have no basis to compel these individuals to arbitration.

    F.  **FLAC Requires Ms. Wagoner to Sign a Covenant not to Sue**.

  Ms. Wagoner is prohibited from bringing any claim, charge, action or cause of action against any customer or account of AFLAC. (Am. Compl. Ex. B, Associates Agreement, ¶10.8.) The arbitration provision contains language that states the parties agree to arbitrate disputes "arising under or related in any way to the agreement".  To some extent, this provision attempts to limit the potential disputes subject to arbitration between the Ms. Wagoner and AFLAC. (*Id*. ¶10.1.)  However, as to the individuals named in the Covenant not to Sue, the agreement does not include the same limitation of "of arising under or related to" the [associates,] agreement.

10

This limitation is one-sided and does not apply to AFLAC. The provision could also be interpreted to preclude her from any remedy. (Id. ¶10.1.)

### G. The Agreement is Unenforceable because it prevents Ms. Wagoner from effectively enforcing her statutory rights.

Despite the courts' recognition that federal statutory claims can be resolved through arbitration, case law clearly holds that the litigant must be able to effectively enforce his or her statutory rights in the arbitral forum. *Green Tree et al. v. Randolph*, 531 U.S. 79, 89 (2000). While looking at state law construction for the validity of an agreement, the court will also ensure that the agreement allows the litigant to enforce his or her statutory rights. The *Cole* Court has concluded that an arbitration agreement is enforceable if it,

(1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum.

*Gilmer v. Interstate/Johnson Lane, Corp.,* 500 U.S. 20, 114:/ Ed/ 2d 27 (1991); *Cole v. Burns Intern. Sec. Services,* 323 U.S. App D.C. 133, 105 F.3d 1465 (D.C. Cir. 1997).

The arbitration agreement does not provide for relief that would otherwise be available in court. Damages available to Ms. Wagoner under her ERISA claims and state law, claims, provide for remedies outside those provided for by statute. Therefore, she cannot adequately enforce her rights through arbitration. Her state law claim for unfair and deceptive trade practices includes a remedy of treble damages and attorneys' fees. Her ERISA claims also include statutory damages, including attorneys' fees that she would be precluded from recovering, even were she to successfully prove her claim before the arbitration panel. Thus, the

11

provision for arbitration should be struck for failing to meet the fourth *Cole* factor which requires that all types of relief otherwise available from the court must also be available through arbitration. *Id.*

Beyond limiting its own damages, AFLAC seeks to impose additional damages on Ms. Wagoner by adding a provision that reads, "Associate shall indemnify in full for any claims, costs, liability or harm, including reasonable attorneys' fees incurred by AFLAC as a results of Associate's breach of the terms of this Agreement or non-fulfillment of any representation, warranty agreement or covenant of this Agreement. This indemnification shall be in addition to any other remedies may have." (Am. Compl. Ex. B, Associates Agreement, ¶10.8.)

The indemnification language is hidden at the bottom of a paragraph that prohibits Ms. Wagoner from bringing legal actions or claims against third parties and then continues to provide broad indemnification for any provision contained in the Associates Contract. There is no penalty or indemnification clause that provides that AFLAC shall be responsible for indemnifying Ms. Wagoner for its breach of the Associates Agreement.

In the interest of fundamental fairness, the courts will only uphold an arbitration agreement that is valid upon its face. Where there is a limitation on damages, contrary to the statutory scheme, the courts will not sever such a provision in order to render the contract enforceable. *Gilmer* at 28.

The fifth *Cole* factor requires that the cost of an arbitral forum for the litigants' claim may not impose unreasonable or excess expenses on as a condition of having claims properly heard. Under the terms of Paragraph 10 of the Associates Agreement, costs are allocated in the following manner:

12

1. Ms. Wagoner will be responsible for the selection of a "party arbitrator";

2. Payment for one-half the cost of a "neutral" arbitrator is optional;

3. The agreement provides for discovery, but is silent on how the cost of discovery will be borne between the parties, and it would appear that Ms. Wagoner would be responsible for the costs of discovery, and

4. The agreement is also silent on whether the arbitration will occur using the American Arbitration Association or another such agency to facility the process and what costs may or may not be involved.

Regardless of how the costs are distributed between the parties, Ms. Wagoner is not financially in a position to pay for any costs associated with arbitration. Currently, Ms.Wagoner is unemployed, homeless and is borrowing money in order to sustain her day-to-day existence. (Am. Compl. Ex. C. Wagoner Aff.) Furthermore, the limitation of her claims and damages is restricted to claims under contract and the amount of remedy is only that which would be available under contract. (Am. Compl. Ex. B, Associates Agreement, ¶10.7.) The claims brought forward by Ms. Wagoner are not in contract. With such a limitation, she could easily find herself in a position in which her recovery is potentially less than her costs.

### H. The Arbitration Agreement as Written Violates the Covenant of Good Faith and Fair Dealings.

In all contracts there is an implied covenant of Good Faith and Fair Dealings between the parties. There is evidence of good faith when the parties have united for a common purpose. The purpose of an arbitration agreement is to expedite a claim in a less formal setting, while allowing the parties to have a fair hearing before the arbitrator. It is also inherent in good faith that each party has justified expectations of the other party and knows how that party will proceed in the

13

event of a dispute. Poor faith is evidenced by an intent to avert the intent or spirit of the bargain and to use unequal bargaining strengths in order to mandate the terms of an agreement to skew the process, in favor of oneself. *Hooters of America, Inc. v. Hooters of Myrtle Beach, Inc., et al.,* 173 F.3d, 933 (4th Cir. 1999). Based upon the arguments made above, AFLAC has violated the covenant of good faith and fair dealings. The agreement is so slanted in providing limited remedies for AFLAC while limited claims and remedies for Ms. Wagoner.

## CONCLUSION

Based on the foregoing, it is clear that the arbitration provision is unconscionable and oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other hand. Therefore, Ms. Wagoner respectfully requests that the court deny AFLAC's Motion to Dismiss and to Compel Arbitration.

Respectfully submitted, this the 4th day of November, 2008.

          **MEYER LAW OFFICES, P.A.**

**BY:** /s/Deborah N. Meyer
Deborah N. Meyer
North Carolina State Bar No.: 19186
402 Harrison Oaks Blvd., Suite 321
Cary, North Carolina, 27513
Telephone: (919) 678-8200
Facsimile: (919) 678-8280
*Attorney for Plaintiff*

14

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of November, 2008, I electronically filed the foregoing Memorandum of Law with the Clerk of the Court using the CM/ECF system which will send notification of such filing to: D. Erik Albright, erik.albright@smithmoorelaw.com; Alexander L. Maultsby, alex.maultsby@smithmoorelaw.com; and T. Matthew Creech, matt.creech@smithmoorelaw.com.

        **BY:**   /s/Deborah N. Meyer
                Deborah N. Meyer
                North Carolina State Bar No.: 19186
                402 Harrison Oaks Blvd., Suite 321
                Cary, North Carolina, 27513
                Telephone: (919) 678-8200
                Facsimile: (919) 678-8280
                Attorney for Plaintiff